1 │ SEDGWICK, DETERT, MORAN & ARNOLD LLP
│ DAVID M. HUMISTON  Bar No. 90579
2 │ EDWARD A. STUMPP  Bar No. 157682
│ 801 South Figueroa Street, 19th Floor
3 │ Los Angeles, California 90017-5556
│ Telephone: (213) 426-6900
4 │ Facsimile: (213) 426-6921
│ david.humiston@sdma.com
5 │ edward.stumpp@sdma.com

6 │ Attorneys for Defendant
│ UNITED HEALTH CARE HEALTH INSURANCE COMPANY
7

8 │ UNITED STATES DISTRICT COURT

9 │ NORTHERN DISTRICT OF CALIFORNIA

10

11 │ JACK HANNA,                           CASE NO. **C 07 3639 EDL**

12 │         Plaintiff,                    **DECLARATION OF CHRISTINA STECKI**
│                                         **IN SUPPORT OF PETITION FOR**
13 │     v.                               **REMOVAL**

14 │ CITY AND COUNTY OF SAN
│ FRANCISCO; SAN FRANCISCO
15 │ GENERAL HOSPITAL; UNITED
│ HEALTH CARE HEALTH INSURANCE
16 │ COMPANY; and DOES 1-25, inclusive,

17 │         Defendants.

18 │     I, Christina Stecki, declare:

19 │     1.    I make this declaration in support of UnitedHealthcare Insurance Company's

20 │ (erroneously sued as "United Health Care Health Insurance Company") ("UnitedHealthcare")

21 │ Petition for Removal. I have personal knowledge of the facts stated in my declaration and, if

22 │ called to testify as a witness, I would and could testify competently to those facts.

23 │     2.    I am a Legal Services Specialist for UnitedHealthcare. I have been employed by

24 │ UnitedHealthcare for approximately two (2) years. I have held my current position for

25 │ approximately one (1) year. My current duties include the day-to-day management and handling

26 │ of legal matters and actions brought against UnitedHealthcare. In my capacity as a Legal

27 │ Services Specialist, I have access to, among other things, UnitedHealthcare databases which

28 │ show enrollment information on all UnitedHealthcare members including commercial, senior and

1    direct enrollee members.  It is also part of my responsibilities to be familiar with the contracts

2    that UnitedHealthcare enters into with various employer groups.

3          3.       UnitedHealthcare records reflect that National Service Industries ("NSI") is a

4    mid-sized group.  A true and correct copy of the Administrative Services Agreement ("ASA")

5    issued by UnitedHealthcare to NSI is attached hereto as Exhibit "A."

6          4.       UnitedHealthcare records reflect that Jack Hanna obtained UnitedHealthcare

7    health care coverage for himself, as a benefit of his employment with NSI.  A true and correct

8    copy of Mr. Hanna's Eligibility History Screens is attached hereto as Exhibit "B."

9          5.       The UnitedHealthcare health care plan, as set forth in the ASA, issued by

10    UnitedHealthcare to NSI, is the plan under which Mr. Hanna obtained health care coverage and

11    is an ERISA plan governed by 29 U.S.C. §§ 1001, et seq.

12          6.       I have personally reviewed UnitedHealthcare's records, indicating that Mr.

13    Hanna's health care coverage through UnitedHealthcare was effective from January 1, 2001 to

14    November 1, 2005.

15          7.       All of the exhibits to my attached declaration are created and maintained by

16    UnitedHealthcare in the normal and ordinary course of business.

17          I declare under penalty of perjury under the laws of the State of California that the

18    foregoing is true and correct and that this declaration was executed on this 10th day of July, 2007,

19    at Cypress, California.

20

21                           Christina Stecki

22

23

24

25

26

27

28

**Exhibit A**

# Administrative Services Agreement

This Administrative Services Agreement (called the "Agreement") covers the services we are providing to NATIONAL SERVICE INDUSTRIES, INC. for use with its self-funded employee health benefit plan and flexible spending account plan.

These services include:

- Claims Administration

- Demand - Side Management Programs

- Case Management

- Medical Management

- Managed Care Networks

- Transplant Benefit Management Program

- Other Administrative Services

This Agreement is structured so that the General Provisions appear first and the related Exhibits follow. The Agreement consists of this page, the main body following this page, and the Exhibits.

United HealthCare Insurance Company identifies this arrangement as Contract No.: 184149

By signing below, each party agrees to the terms of this Agreement.

| **NATIONAL SERVICE INDUSTRIES, INC.** | **UNITED HEALTHCARE INSURANCE COMPANY** |
|---|---|
| By _____ | By _____ |
| Authorized Signature | Authorized Signature |
| Name _____ | Name  Jo-Ann Wollman |
| Title _____ | Title   Contract Account Executive |
| Date _____ | Date   February 9, 1998 |

3

# Table of Contents

## General Provisions

**Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**Employee Benefit Plan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    The Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Responsibility for the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Description of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Plan Consistent with the Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Plan Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Affiliated Employers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Records, Information, Audits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
    Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Access to Information for You . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Access to Information for Other Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    ERISA Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Audits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Confidential Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Indemnification** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
    We Indemnify You . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    You Indemnify Us . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Taxes And Assessments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
    Payment of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Validity of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Additional Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Tax Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Your Other Responsibilities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
    Eligibility Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Notices to Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Service Fees** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
    Service Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Standard Service Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Changes in Standard Service Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Additional Service Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Due Dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Payment Timing and Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Reconciliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Term Of The Agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
    Services Begin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Agreement Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Services End . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4

**Termination Of The Agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
    Termination Events. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Termination Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Subcontracting Services, Assignment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
    Subcontractors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Assignment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Governing Law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

**Entire Agreement, Amendment, Waiver, Disputes** . . . . . . . . . . . . . . . . . . . . . . . . . **13**
    Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Services Provisions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
    Claims Administration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Benefit Appeals Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Other Administrative Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Demand-Side Management Programs  (Applies Only to the Out-of-Area Plan) . . . . . . . . . . . . 19
    Case Management Services  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Medical Management Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Managed Care Network Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Transplant Benefit Management Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# Exhibits

**Exhibit A** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**
    Service Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Exhibit B** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**
    Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Exhibit C** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**
    Performance Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Exhibit D** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**
    Claim Risk Sharing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Exhibit E** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**
    Third Party Disclosure Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34



# General Provisions

## 1.  Definitions

| | |
|---|---|
| **Affiliated Employer** | means an entity that is affiliated with you and whose employees or former employees are covered by the Plan. |
| **Agreement Period** | means the period specifically defined in Section 8.2 of the Agreement. |
| **Confidential Information** | means information that: |

a. contains personally identifiable or health information about or obtained from a Participant or health care provider, or

b. contains information about your business or our business that is confidential, proprietary, trade secret or is not available to the public, or

c. has been designated by you or us as confidential or proprietary.

| | |
|---|---|
| **Due Date** | means the date that a fee or other amount owed by you under this Agreement is due. It is more specifically defined in Section 7.5. |
| **Effective Date** | means January 1, 1998. |
| **Employee** | means a current or former employee of you or an Affiliated Employer. |
| **ERISA** | means the Employee Retirement Income Security Act of 1974 as amended from time to time. |
| A claim is **Incurred** | on the date health care services are rendered to or supplies are received by a Participant. |
| **Our, Us** and **We** | mean United HealthCare Insurance Company. The words may or may not be capitalized. |
| **Participant** | means an Employee or spouse or dependent who is covered by the Plan. |
| **Party** and **Parties** | mean United HealthCare Insurance Company and NATIONAL SERVICE INDUSTRIES, INC. , the parties to this Agreement. The words may or may not be capitalized. |
| **Plan** | means the plans maintained by you to which this Agreement applies. It is specifically defined in Section 2.1. |
| **Plan Administrator** | means "administrator" or "plan administrator" as these terms are defined under ERISA and shall refer to the current or succeeding person, committee, partnership or other entity designated as such by the terms of the instrument under which the Plan is operated, or by law. |
| **Self fund and Self-funded** | mean that you have sole responsibility to pay, and provide funds, for all Plan benefits out of your general assets. We have no liability to provide these funds. This is true even if we provide stop loss insurance to you. |
| **You** and **Your** | mean NATIONAL SERVICE INDUSTRIES, INC. . The words may or may not be capitalized. |

## 2. Employee Benefit Plan

### 2.1 The Plan

The Plans to which this Agreement applies are:

A: The National Service Industries, Inc. Self-Insured Medical Plan.

B: The National Service Industries, Inc. Health Care Spending Account Plan and National Service Industries Dependent Care Spending Account Plan.

Whenever "Plan" is referenced in this Agreement it means all of the above plans jointly unless otherwise specified.

### 2.2 Responsibility for the Plan

Except to the extent this Agreement specifically requires us to have the fiduciary responsibility for a Plan administrative function, and except for indemnifiable matters under Section 4.1 below or otherwise set forth in this Agreement, you accept total responsibility for the Plan for purposes of this Agreement including its benefit design and compliance with any laws that apply to you or the Plan, whether or not you are the Plan Administrator. We are not the Plan Administrator of the Plan.

### 2.3 Description of the Plan

You will give us a written description of the Plan benefits and all other provisions of the Plan within a reasonable period of time prior to the Effective Date, or the effective date of any changes, so that we will be able to provide our services under this Agreement. This shall include, but not be limited to, the ERISA Summary Plan Description.

### 2.4 Plan Consistent with the Agreement

You represent that the Plan provisions are consistent with this Agreement and the services we are providing. Copies of Plan documents and employee communications shall be supplied to us in a timely manner when we request them. You will amend them if references to us are not acceptable to us or if any Plan provision is not consistent with this Agreement or the services we are providing.

### 2.5 Plan Changes

If you make any material change to the Plan's benefits or other relevant Plan provisions:

a. You will notify us of the change, including termination of the Plan, in writing within a reasonable period of time before the change is effective.

b. We can decide not to continue providing our services as a result of those changes. If so, we will give you written notice of termination of this Agreement within ninety (90) days after we get your notice of the change.

c. If we decide to continue providing our services with those changes both of the following apply:

    i. You will pay us for the reasonable costs we actually incur, if any, to put the Plan changes in place.

    ii. The fees you are required to pay under this Agreement may be changed by us accordingly pursuant to Section 7.3 of this Agreement.

7

**2.6     Affiliated Employers**

You shall supply us with a list of your Affiliated Employers, if any, prior to our commencing the services we are providing under this Agreement.

You must give us prior written notice of any changes to the list of Affiliated Employers whose Employees are covered by the Plan. You represent the following about you and the Affiliated Employers:

a.  If you are subject to ERISA, you and the Affiliated Employers together make up a single "control group" as defined in Section 3(40)(B) of ERISA.

b.  If you and the Affiliated Employers are governmental entities, you have the legal authority to self-fund the Plan.

c.  If your Plan is related to a collective bargaining agreement, together, you and the Affiliated Employers make up a "multi-employer plan" as defined by the Taft-Hartley Act.

# 3.     Records, Information, Audits

**3.1     Records**

We will keep records relating to the services we provide under this Agreement for as long as we are required to do so by law.

**3.2     Access to Information for You**

If you need information (as in relation to the services we provide, essential for you to comply with ERISA reporting requirements e.g. 5500 form) we have in order to administer the Plan or to comply with your legal requirements, we will give you access to that information under the following circumstances:

a.  The information must relate to our services under this Agreement.

b.  We must possess the information or it must be within our control.

c.  You must give us reasonable prior notice of the need for the information.

d.  We will provide the information only while this Agreement is in effect and for a period of six (6) months after the Agreement terminates, unless you demonstrate that the information is required by law for Plan purposes.

e.  We will not provide access to any information if the law prohibits such access.

**3.3     Access to Information for Other Entities**

We will also provide access to information to an entity providing services to you, such as an auditor or other consultant, if you request it.  In that case, the rules in Section 3.2 will apply and:

a.  We will provide such access only at reasonable intervals of time.

b.  We can deny access to Confidential Information to any entity if we reasonably determine that it will be harmful to our business to give it to them. For example, if that entity is a competitor of ours and we do not want them to learn proprietary information about our business, we can deny access.

c.  Before we will give access to Confidential Information to that entity, that entity must sign our "Third Party Disclosure Agreement", a specimen of which is attached to this Agreement as Exhibit E. You agree to the terms of that Agreement.

## 3.4  ERISA Information

We will give you the information that ERISA requires us to give you, within the time period required by ERISA.

## 3.5  Audits

During continuance of this Agreement and at any time within twelve (12) months following this Agreement's discontinuance, you can audit us in order to determine whether we are meeting the commitments we made under this Agreement. These are the rules that apply to audits:

a.  The place, time, type, duration and frequency of all audits must be reasonable and agreed to by us.

b.  All audits shall be limited to information relating to the calendar year in which the audit is conducted and the immediately preceding calendar year.

c.  You will pay any expenses that are incurred by you for the audits. You will also pay any unanticipated expenses we actually incur for the audits and all expenses actually incurred by us on any audit initiated after this Agreement is discontinued.

d.  You will be charged an additional fee, reasonably determined by us, for any audits that we agree to which exceed the following guidelines:

    i.  One audit every twelve (12) months.

    ii.  Any on-site audit visit that is not completed within five (5) business days.

e.  The audit can be conducted by you or by another entity that you select and not in competition with us.

f.  All of the other rules in this Records, Information, Audits Section also apply to audits.

g.  You will provide us with a copy of any final audit reports. You will provide us with a copy of any final audit reports, or sections of the report which are not considered to be protected as an attorney/client privileged communication.

## 3.6  Confidential Information

Except as stated in the following paragraph, the following rules apply when either party receives Confidential Information:

a.  The Confidential Information will be used solely to administer the Plan or to perform under this Agreement.

b.  The Confidential Information will not be disclosed to any person or entity other than either party's employees, agents, or representatives needing access to the information to administer the Plan or perform under this Agreement.

c.  However, we are permitted to disclose such information to our subcontractors if it is necessary in order to perform under this Agreement. In that case, we will hold our subcontractors to the same standards of confidentiality outlined here.

d.  Either party can disclose Confidential Information if required by law, provided that the disclosing party just gives the other party written notice of the required disclosure and an opportunity to seek a protective order or other appropriate remedy.

We can use non-individually identifiable Confidential Information for the purposes of creating comparative databases, statistical analysis or other studies. The databases, analyses and studies are considered proprietary information about our business.

---

## 4.   Indemnification

### 4.1   We Indemnify You

We will indemnify you and hold you harmless against any losses, liabilities, penalties, fines, costs, damages, and expenses, including reasonable attorneys' fees, that you incur as a result of our gross negligence or willful misconduct or material breach of this Agreement.

### 4.2   You Indemnify Us

You will indemnify us and hold us harmless against any losses, liabilities, penalties, fines, costs, damages, and expenses, including reasonable attorneys' fees, we incur individually or in the aggregate as a result of your gross negligence or willful misconduct or material breach of this Agreement.

---

## 5.   Taxes And Assessments

### 5.1   Payment of Taxes

You will reimburse us for the taxes, assessments and all other federal, state, local or other governmental charges (jointly referred to in this Section 5 as "Tax") that are assessed against us or that we are required to pay, now or in the future, relating to the Plan, benefit payments under the Plan, this Agreement or our fees or services under this Agreement (but not taxes on our net income).

### 5.2   Validity of Taxes

We have the authority and discretion to determine whether any such Tax against us should be paid or disputed. We will act reasonably in making that determination.

### 5.3   Additional Expenses

You will also reimburse us for a proportionate share of any cost or expense reasonably incurred by us relating to such Tax, including costs and reasonable attorneys' fees incurred in disputing such Tax, and any interest, fines, or penalties relating to such Tax.

### 5.4   Tax Reporting

In the event that the reimbursement of any benefits to Participants in connection with this Agreement, including but not limited to lodging or meals under the Transplant Benefit Management Program, is subject to tax reporting requirements, you are responsible for complying with these requirements.

### 5.5   Survival

This Section 5 shall survive any termination of the Agreement.

*10*

## 6. Your Other Responsibilities

### 6.1 Eligibility Information

You will tell us which of your Employees, their dependents and/or other persons are eligible to be Plan Participants and provide information we need concerning the Participants' individual accounts under the flexible spending account plans. This information must be:

a. in a format to which we agree,

b. accurate, and

c. given to us at least 10 business days before the person's coverage begins or as soon as practicable before or after the person's coverage ends (as the case may be). You understand that benefits paid by us to former Plan Participants based on untimely eligibility information provided to us is your sole responsibility.

### 6.2 Notices to Participants

a. You will give Participants the information and documents they need to obtain benefits under the Plan within a reasonable period of time before coverage begins.

b. In the event of this Agreement's discontinuance, you will notify all Participants of the discontinuance of the services we are providing under this Agreement.

## 7. Service Fees

### 7.1 Service Fees

You will pay us fees for our services. These fees consist of standard service fees and additional fees described herein.

### 7.2 Standard Service Fees

The standard service fees are listed in Exhibit A of this Agreement. These fees are effective for the period set forth in that Exhibit.

### 7.3 Changes in Standard Service Fees

a. **Events.** We can change the standard service fees on each Agreement Period anniversary approved in Exhibit A. We can also change the amount of the standard service fees at any time if:

    i. any material changes are made to this Agreement or the Plan, which materially affect the fees, or

    ii. the number of Employees covered by the Plan or any option of the Plan changes by ten percent (10%) or more, when compared to the number of Employees covered on the date that the amount of the then current standard service fee was first effective.

b. **Effective Date of New Standard Service Fees**.

  i. The fees effective for Agreement Periods after the first Agreement Period shall be specified by us in a written notice given to you not less than thirty (30) days before the new fees are to be effective.

  ii. If we do not give you at least thirty (30) days prior written notice of the new fees for the new Agreement Period, then the then current fees will be in effect until thirty (30) days after we give you written notice of the new fees.

  iii. Any new standard service fee which arises out of a change in plan or change in number of Employees will be effective on the date those changes occur, even if that date is retroactive.

c. **Due Date of New Fees**. The "Due Date" for the new standard service fees is the later of:

  i. the effective date of the new fee, or

  ii. thirty (30) days after we give you written notice of the new fees.

d. **Termination.** If you do not agree to the new standard service fees, you may terminate this Agreement by giving us written notice effective as of the date specified therein, within thirty (30) days after you receive written notice of the new fees. You must still pay any amounts due for the periods during which the Agreement is not terminated.

**7.4    Additional Service Fees**

In addition to the standard service fees specified on Exhibit A, you must also pay us any additional fee that has been authorized by a provision elsewhere in this Agreement. In cases where that additional fee is to be determined by us, we will tell you the amount of the fee in writing, and if you do not agree to the amount, you may elect not to receive the additional service.

**7.5    Due Dates**

a. We will bill you for the amounts that you owe us. In those cases, the Due Date for these amounts is within thirty (30) days after the date of the bill.

b. You must pay the amounts you owe us within thirty (30) days after their Due Date, except that if the amount due is disputed in good faith, you will pay at least 85% of the amount due within thirty (30) days. (Both parties will attempt to resolve disputed amounts within the following sixty (60) days after which period you will pay the amount agreed to or the amount of the original billing if unresolved. All charges and payments are subject to annnual reconciliation and submitted to you no later than May 1, each year, begining in 1999). This thirty (30) day period is called the "Grace Period". If you do not pay the amounts owed within the Grace Period then:

  i. You will pay us interest on any amounts deemed to be owed and unpaid, as described in the section below.

  ii. You agree to reimburse us for any costs, such as reasonable attorneys' fees, we incur to collect any amounts deemed to be owed and unpaid.

  iii. We may terminate this Agreement upon written notice to you in accordance with Section 9.1 (d).

**7.6    Payment Timing and Interest**

a. For payments made in the first half of the due month or earlier, you will be credited interest on amounts paid at the current interest credit rate specified in Exhibit A.

/2

b.  For payments made in the second half of the due month but not later than the end of the Grace Period, you will be charged interest on amounts paid at the current interest credit rate specified in Exhibit A.

c.  For payments made after the end of the Grace Period, you will be charged interest on amounts paid at the current interest penalty rate specified in Exhibit A.

d.  If you overpay any amount owed, you will be credited interest on the amount overpaid at the current interest credit rate specified in Exhibit A.

e.  If you underpay any amount owed, you will be charged interest on the amount underpaid at the interest penalty rate specified in Exhibit A.

### 7.7  Reconciliation

For every Agreement Period, we will reconcile the total amounts you paid with the total amounts you owed, including any interest on those amounts.

a.  If we owe you money as a result of that reconciliation, your next bill will be credited. If the Agreement is terminated, then we will pay you the amount owed within thirty (30) days after we perform a final reconciliation.

b.  If you owe us money as a result of the reconciliation, you will pay us within thirty (30) days after receiving witten notice of the amount you owe. For payments made after the thirty days, we will charge interest on the amounts paid at the current interest penalty rate specified in Exhibit A.

## 8.  Term Of The Agreement

### 8.1  Services Begin

We will begin providing you services under this Agreement on the Effective Date. Our services apply only to claims for Plan benefits that are Incurred on or after January 1, 1998.

### 8.2  Agreement Period

This Agreement will apply for an initial "Agreement Period" of twelve (12) months commencing on the Effective Date and will automatically continue for additional Agreement Periods unless and until it is terminated.

### 8.3  Services End

Our services under this Agreement stop on the date this Agreement terminates in accordance with its terms, regardless of the date that claims are Incurred. However, we may agree to continue providing certain services beyond the termination date, as described in a separate agreement or as provided elsewhere in this Agreement. For example, we may agree to provide claims administration services for the flexible spending account plan for an extended period with respect to services rendered prior to the termination date.

## 9.  Termination Of The Agreement

*13*

**9.1**    **Termination Events**

This Agreement will terminate when:

a.   The Plan terminates.

b.   Both parties agree in writing to terminate the Agreement.

c.   After the first twelve (12) months of the Agreement, if either party terminates, the Agreement at any time for any reason by giving the other party at least ninety (90) days prior written notice.

d.   We give you written notice of termination because you did not pay the fees or other amounts you owed us under this Agreement within the Grace Period.

e.   You terminate the Bank Account.

f.   A party gives written notice to the other party which is in breach of this Agreement, other than by non-payment or late payment by you of fees owed, and does not correct the breach within thirty (30) days after being notified in writing by the other party of such breach.

g.   If any state or other jurisdiction will penalize a party for administering the Plan under the terms of this Agreement, the party may immediately discontinue the Agreement's application in such state or jurisdiction. Written notice must be given to the other party as soon as reasonably practical. The Agreement will continue to apply in all other states or jurisdictions.

h.   There may be other places in this Agreement authorizing you or us to terminate the Agreement.

**9.2**    **Termination Services**

We will provide the following standard services upon termination of this Agreement:

a.   Our regular monthly claim reports.

b.   Information for your Preparation of Form 5500, Schedule C, for the period from the end of the last Plan period up to the date of termination.

c.   Banking services and reports that are specified in Section 13.1 of this Agreement.

## 10.    Subcontracting Services, Assignment

**10.1**    **Subcontractors**

We are permitted to use our affiliates or other subcontractors to perform services under this Agreement. However, we will be responsible for those services to the same extent that we would have been had we performed those services without the use of an affiliate or subcontractor.

**10.2**    **Assignment**

Except as provided in this paragraph, neither party can assign this Agreement or any rights or obligations under this Agreement to anyone without the other party's written consent. That consent will not be unreasonably withheld. Notwithstanding, we can assign this Agreement, including all of our rights and obligations to our affiliates in the same line of business as us subject to prior written notice to you of the assignment.

*14*

## 11.    Governing Law

Except as noted, this Agreement is governed by ERISA. To the extent that state law applies, this Agreement will be governed by the laws of the State of Connecticut. With respect to the flexible spending account plans, this agreement is governed by section 125 of the Internal Revenue Code.

## 12.    Entire Agreement, Amendment, Waiver, Disputes

### 12.1    Entire Agreement

This Agreement, with its Exhibits, is the entire Agreement between the parties governing the subject matter of this Agreement. This Agreement replaces any prior written or oral communications or agreements between the parties relating to the subject matter of this Agreement. The headings and titles within this Agreement are for convenience only and are not part of the Agreement.

### 12.2    Amendment

This Agreement may be amended only by both parties agreeing to the amendment in writing.

### 12.3    Waiver

Nothing in this Agreement is considered to be waived by any party unless the party claiming the waiver receives the waiver in writing. No breach of the Agreement is considered to be waived unless the non-breaching party waives it in writing.

### 12.4    Disputes

In the event that any dispute relating to this Agreement arises between the parties, the dispute shall be resolved by binding arbitration before the American Arbitration Association. Any such dispute shall be resolved by three (3) arbitrators. Each party shall choose one (1) arbitrator and the two (2) arbitrators so chosen shall choose the third arbitrator. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C.Sections 1-16. The fees and expenses of the arbitrators shall be shared equally amongst the two parties. In no event may the arbitration be initiated more than one year after the date one party first gave written notice of the dispute to the other party. The arbitration shall be held in Atlanta, Georgia. The arbitrators shall have no power to award any punitive or exemplary damages or to ignore or vary the terms of this Agreement and shall be bound by controlling law.

## 13.    Services Provisions

### 13.1    Claims Administration

We must perform our administrative duties outlined in this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting

*15*

in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, and act in accordance with ERISA and other applicable laws.

**a.  Definitions**

   i.  **Bank** means The Chase Manhattan Bank, N.A., New York, New York.

   ii.  **Bank Account** means the bank accounts you establish and maintain at the Bank for payment of Plan benefits and expenses. The Bank Accounts contain funds which are your general assets and are not Plan Assets. The Plan and its Participants have no claim, right or interest in the Bank Account.

   iii.  You will establish and maintain a separate Bank Account for the flexible spending account plans.

   iv.  **Check** means the negotiable instrument we use for the payment of Plan benefits. It may be a check or a draft. The word may or may not be capitalized.

**b.  Claims Processing**

   i.  **Claim Submission.** Claims for Plan benefits must be submitted in an electronic or paper form that is reasonably satisfactory to us.

   ii.  **Benefit Determination.** We will determine whether a benefit is payable under the Plan for claims submitted to us by Plan Participants or the health care provider.

   (A)  Our determination will be based on and consistent with the Plan's provisions.

   (B)  In order to apply the Plan's provisions we will use procedures, standards, and practices that we develop for benefit claim determination. We refer to these as Claim Procedures.

   (i)  You delegate to us the discretion and authority to use such Claim Procedures.

   (C)  We will provide services to recover Overpayments that have been made by us under this Agreement. "Overpayments" are payments that exceed the amount payable under the Plan. The Overpayment could have been made for any reason other than those identified in Section 13.1.e below. For example, an error could have been made because of provider billing error, retroactive eligibility information, or coordination of benefits disputes.

   (i)  For Overpaymetns not directly caused by us, we will deduct the expenses incurred to obtain the recovery and we will credit your Bank Account with the net amount of the recovery.

   (ii)  We will reimburse you for any benefit payments made by us if the Overpayment was due to our gross negligence, our fraud or our criminal act and we will remain responsible for our own expenses related to the recovery thereof.

   (iii)  We will not pursue recovery of Overpayments if any applicable law does not permit it or if recovery would be improbable, not cost effective, or impractical. Recovery would be deemed "impracticable" if your Plan does not have appropriate language authorizing the recovery.

   iii.  **Determination to Pay Benefits.** If it is determined that a benefit is payable, we will issue a check for the benefit payment to the appropriate payee, or we will credit the benefit payment to the payee in another form.

/ 6

iv. **IRS Reporting of Benefit Payments.** With respect to the health benefit plan, we will report the benefit payments made to health care providers as required by the Internal Revenue Service by filing Form 1099s.

v. **Providing Funds for Benefit Payments.** The check or other crediting of funds to pay the Plan benefits will be provided by you as described in Section 13.1.d.

vi. **Determination to Deny Benefits.** If we determine that all or a part of the benefit is not payable under the Plan, we will notify the claimant of the denial and of the claimant's right to appeal the denial. This notification will be designed to comply with Plan and ERISA requirements for denial notices.

vii. **Appeals of Denied Benefits.** If we deny a benefit payment, we will provide the appeal services outlined in Section 13.2.

viii. **Claim Litigation.** If legal or administrative proceedings are brought against you or us in regard to a Plan benefits claim, there will be appropriate cooperation between the Parties. Except for indemnifiable matters under Section 4.1 above or set forth elsewhere in this Agreement. You will be responsible for all legal fees and expenses of the Parties in defending the claim.

c. **Run-Out Administration**

i. We will not provide Claim Processing Services after the date of termination of this Agreement except if we agree to do so.

ii. **Additional Fee.** If we agree to do so, for example, with respect to the flexible spending account plans, there will be an additional fee, determined by us and agreed to in writing by you, for processing claims after termination of the Agreement.

iii. **Other Agreement Terms.** All of the other terms of this Agreement will apply to these post-termination services as though the Agreement continued to be in effect.

iv. **Agreement Breach.** We will not provide these claim processing services after termination of the Agreement if the Agreement was terminated because you failed to pay us fees due or you did not provide the funding required under Section 13.1.d or, at our option, when there is termination for any other material breach of the Agreement.

d. **Providing Funds for Benefits**

i. **Self-Funded Plan.** The Plan is Self-funded.

ii. **Bank Account.** You will open and maintain a Bank Account at the Bank for purposes of providing us a means to access your funds for payment of Plan benefits and expenses.

    (A)   The Bank Account will be a part of the network of accounts that have been established at the Bank for our self-funded customers.

    (B)   However, the Bank Account will belong to you and the funds in it are yours.

You will maintain a Bank Account at the Bank in order for you to fund Checks issued and credits of funds made by us pursuant to this Agreement.

iii. **Balance in Account.** You will maintain a balance in the Bank Account sufficient to cover all Checks that have been issued.

iv. **Issuing and Providing Funds for Checks.** The Checks we write and issue to pay Plan benefits under this Agreement will be written on one or more common "zero balance" accounts that are a part of the network of accounts maintained at the Bank for our Self-funded customers.

*17*

(A)     When the Checks for Plan Benefits are presented to the Bank, the Bank will notify us and we will direct the Bank to accept or reject the Checks.

(B)     Then the Bank will withdraw funds from your Bank Account to fund the Checks that are cashed.

v.     **Transfers of Funds.** Funds will also be withdrawn from your Bank Account when a transfer of funds we have made to pay Plan benefits is made by the Bank. For example, when a wire transfer has been made to a health care provider to pay benefits under the Plan.

vi.     **Service Fees and Other Expenses.**   Funds will also be withdrawn from your Bank Account on the Due Date of any service fees which you have authorized to be paid to us and for the payment of other Plan Expenses from your Bank Account (e.g. State imposed sur charge).

vii.     **Calls for Funds.** The withdrawals for Plan benefits and service fees are paid for by the balance you maintain in the Bank Account.

We will notify you of the amount of the Checks that have been issued so that you can transfer funds to the Bank Account. You will transfer that amount using a method agreed upon by us, you and the Bank. This transfer will replenish the balance you are maintaining in the Bank Account.

If you or the Plan has obtained a Stop Loss Policy from us or one of our Subcontractors, we will collect any proceeds payable under the policy and deposit them into the Bank Account.

viii. **Underfunding.** If you do not provide the required amounts for the balance in your Bank Account or for the funds that have been withdrawn from the Bank Account:

(A)     We will provide you written notice, so that you can correct the problem.

(B)     We may stop issuing Checks and suspend any of our other services under this Agreement for the period of time you do not provide the required payment.

(C)     We can also elect to terminate this Agreement upon written notice to you effective as of any date after three (3) business days after we have given you notice of the payment deficiency, if you do not provide the required payment within the three (3) business days unless you have in good faith disputed the amount of such payment and have paid any undisputed amounts as provided herein. The notice provisions contained in Termination of Events, Section 9.1, do not apply to this breach.

(D)     We may also place stop payments on Checks, at your expense, if we determine that you do not have enough funds in the Bank Account to pay the Checks that have been issued but not yet cashed.

(E)     You will pay interest on the amount of underfunding at the standard rate that we charge to our customers for underfunding of bank accounts.

ix.     **Termination of Agreement**

(A)     When this Agreement terminates, the method of providing funds for Plan benefits remains in place for a limited period of time. This method is described in Sections 13.1. d. iii. through vii.

(B)     After this period is over, that method of funding will cease and, instead, you will deposit and maintain in the Bank Account enough funds to cover all Checks for Plan benefits that have been issued but not cashed.

*18*

(C)   This balance will remain in the Bank Account for a limited period of time in order to fund the outstanding Checks. This period will be reasonable, determined by us, and applied on a consistent basis to our self-funded customers (subject to approval by NSI).

(D)   At the end of this period, we will place stop payments, at your expense, on all Checks that remain uncashed, and you will close your Bank Account and recover any funds remaining in it.

(E)   We will provide bank account statements and bank reconciliation reports, including reports you need for the purposes of escheatment.

### e.   Claims by Other Plans, Persons or Entities

If there is any claim that we are an entity responsible for paying benefits or making any payment on behalf of the Plan to another health benefits plan or to any other person or entity, including but not limited to a claim based upon the federal Medicare secondary payor laws, you shall indemnify and hold us harmless with respect to such a claim and all costs associated with the claim. You shall cooperate with us as necessary and appropriate to facilitate timely payment by you. Where necessary or appropriate you will administer and pay such claims. When such claims involve taxes, assessments or other governmental charges, the claims shall also be subject to Section 5 of this Agreement. This provision shall survive any termination of the Agreement.

### f.   Escheat

You are solely responsible for complying with all abandoned property or escheat laws, for making any required payments and for filing any required reports, to the extent that they may be applicable.

## 13.2   Benefit Appeals Services

### a.   Appeals of Denied Benefits

i.   **Review by Us.** If we deny a Plan benefit claim, the claimant will be notified in accordance with Plan and ERISA requirements for claim denial notices that the claimant may appeal the denial by submitting an appeal to us within 60 days from the date of the denial. Any appeal received after the 60-day period will be denied as untimely.

(A)   We will review any appeal that is received within the 60-day timeframe and decide whether the benefit is available under the Plan.

(B)   If our determination that the benefit is not available was made before the health care services or supplies are rendered, then we may conduct this review on an expedited basis.

ii.   **Our Determination to Deny Benefits.** If, after the review, we decide that the benefit is still not available under the Plan:

(A)   We will notify the claimant of this second level claim denial by us and of the claimant's right to further appeal the denial to you for a full and fair review which will be final and binding.

(B)   This notification will be designed to comply with Plan and ERISA requirements for claim denial notices.

iii.   **Review by You.** You wil review the appeal and decide whether the benefit is payable under the Plan.

**iv. Your determination to Pay Benefits**. If, after the review, you decide that the benefit is payable, you will notify us and the claimant.

**v. Your determination to Deny Benefits**. If, after the review, you decide that the benefit is still not payable under the Plan:

  (A)   You will notify us and the claimant of the denial in accordance with Plan and ERISA requirements for final appeal denial notices.

  (B)   Your determination will be final and binding on the claimant and all others who have an interest in the outcome.

You are the ERISA fiduciary with the responsibility for providing a full and fair review of claims and delegate to us the discretionary authority to construe and interpret the terms of the Plan and to make final, binding determinations concerning availability of Plan benefits.

## 13.3   Other Administrative Services

### a.   Plan Benefit Development

We will review, annually, Plan claim experience and benefits and provide you with recommendations for changes to the Plan. You are responsible for designing the Plan and the Plan benefits and for the written plan instrument required under ERISA.

### b.   Summary Plan Description Booklets

Subject to your review and concurrence, we will provide at no additional cost, the following services in conjunction with your development of "Summary Plan Description" booklets describing the Plan:

  **i.**   Prepare draft language in English.

  **ii.**   Prepare no more than two (2) printer's proofs.

  **iii.**   Print booklets in our standard size and with our standard cover in a quantity equal to 110% of the number of Employees.

  **iv.**   Ship printed booklets to a single location.

You will furnish additional Summary Plan Description information as may be required under ERISA and other applicable laws. We will include that information in the Summary Plan Description booklet.

You will be responsible for the legal sufficiency of the booklets, including any information as may be required under ERISA and other applicable laws.

### c.   Assistance with General Plan Administration

We will provide our standard services, as follows, to assist you with the general administration of the Plan:

  **i.**   Our employer administration kit, administration forms and service orientation.

  **ii.**   Our toll-free customer service telephone line for use by Participants.

  **iii.**   Enrollment support.

Custom services, such as special forms or administrative support that exceeds the level standardly offered to our self-funded customers will be subject to an additional fee determined by us.

### d.   Health Insurance Portability and Accountability Act of 1996

  **i.**   We will produce Certification of Coverage forms for Plan Participants who lose coverage under the Plan on or after January 1, 1998, as required by the Health

Insurance Portability and Accountability Act of 1996 (HIPAA), based on eligibility and termination data that you provide to our eligibility systems in accordance with our data specifications. The Certification of Coverage forms will only include periods of coverage that we administer under the Plan.

ii. The Certification of Coverage forms will only include and be based on data that is currently indicated and available to us in our eligibility systems as of the date that the form is generated. We will give you at least 90 days advance notice of all additional data requirements that we will need to complete the forms and you agree to provide us with that information within this specified timeframe.

iii. We reserve the right to discontinue providing this service if you do not provide the required data we request within the 90 day timeframe or as soon thereafter as reasonably possible.

e. **Reports**

We will provide the reports listed in Exhibit B.

f. **Additional Services**

You may request that we provide services in addition to those promised in this Agreement. If we agree to provide them, then:

i. Those services will be governed by the terms of this Agreement unless otherwise specified in an amendment to this Agreement.

ii. You will pay us an additional fee, determined by us, for those services.

**13.4   Demand-Side Management Programs  (Applies Only to the Out-of-Area Plan)**

We will provide Participants with access to the following services and/or publications:

- Optum NurseLine, a telephone-based 24-hour nurse-line service for health information
- a medical self-care book, The American Medical Association Guide to Your Family's Symptoms
- The Taking Care newsletter

**13.5   Case Management Services**

a. **Definitions**

i. **Alternate Benefits Programs** or **ABP** means a program of benefit coverage for health care services and supplies designed by us and approved by you for the diagnosis and/ or treatment of a particular Participant's illness or injury with medically necessary, appropriate and cost-effective health care services and supplies alternatives that would not otherwise be covered by the Plan. The Plan will pay for and cover as Plan benefits the health care services contained in the ABP for the Participant for whom we developed the ABP.

(A) You have the authority to approve the Plan's coverage of the ABP for the specific Participant.

(B) You delegate to us the discretion and authority to develop and revise ABPs.

ii. **Benefits Management Program** or **BMP** means a program of benefit coverage for health care services and supplies designed by us for the diagnosis and/or treatment of a particular Participant's illness or injury with medically necessary, appropriate and cost-effective health care services and supplies that are covered by the Plan.

21

You delegate to us the discretion and authority to develop and revise BMPs subject to your approval.

**b.  Participation In Case Management Program**

    **i.  Identification of Participants.** We will identify Participants with conditions that are appropriate for case management services. The identification will be based on:

        (A)  referrals made to us by health care providers or others,

        (B)  self-referrals made by Participants, and

        (C)  our own referrals made when we provide other services under this Agreement.

    **ii.  Criteria for Participation.** In order for a particular Participant to be selected for participation in the case management program, the following criteria must be met:

        (A)  The Participant's condition must be covered by the Plan's medical benefits coverage, and/or mental health and substance abuse benefits coverage.

        (B)  We must determine, with your approval in the case of ABP's, that the Plan and Participant could benefit from case management, based, in part, on our established standard criteria which considers:

            (i)  cost, duration, and intensity of health care services expected to be used for the condition and available alternatives,

            (ii)  the Participant's condition and prognosis, and

        (C)  The Participant and health care provider must be willing to participate in the process.

**c.  Case Management Program Services**

    **i.  Development of ABP or BMP.** We will work with Participants who satisfy the criteria for participation in the case management program to develop a program of benefit coverage with medically necessary, appropriate and cost-effective health care services and supplies for the diagnosis and/or treatment of the Participant's condition. This may be an Alternate Benefits Program or a Benefits Management Program or elements of both.

    **ii.  Benefits Determinations Only.** Any recommendations made in developing an Alternate Benefits Program or a Benefits Management Program are recommendations for Plan benefits purposes only. The Participant and his or her health care provider have the sole responsibility to determine which health care services will be provided and to make all treatment decisions.

    **iii.  Additional Services.** For Participants who are following an Alternate Benefits Program or Benefits Management Program, we will, for Plan Benefit purposes:

        (A)  Assist in coordinating the health care services and supplies.

        (B)  Assist in facilitating communication among health care providers and among the providers and the Participant and family members.

        (C)  Identify various services and supplies and health care providers that are available.

        (D)  Monitor the Participant's progress.

    **iv.  Termination of an ABP.** We have the right and authority to determine whether an ABP should end if the criteria are no longer met, subject to your approval in the case of ABP's.

22

**13.6    Medical Management Services**

    **a.    Definitions**

**Medically Necessary or Medical Necessity** means health care services and supplies which are determined by us to be medically appropriate, and (1) necessary to meet the basic health needs of the Participant; and (2) rendered in the most cost-efficient manner and type of setting appropriate for the delivery of the service or supply; and (3) consistent in type, frequency and duration of treatment with scientifically based guidelines of national medical, research, or health care coverage organizations or governmental agencies that are accepted by us; and (4) consistent with the diagnosis of the condition; and (5) required for reasons other than the convenience of the Participant or his or her physician; and (6) demonstrated through prevailing peer-reviewed medical literature to be either: (a) safe and effective for treating or diagnosing the condition or sickness for which their use is proposed, or, (b) safe with promising efficacy (i) for treating a life threatening sickness or condition, and (ii) in a clinically controlled research setting; and (iii) using a specific research protocol that meets standards equivalent to those defined by the National Institutes of Health.

(For the purpose of this definition, the term "life threatening" is used to describe sicknesses or conditions which are more likely than not to cause death within one year of the date of the request for treatment.)

The fact that a physician has performed or prescribed a procedure or treatment or the fact that it may be the only treatment for a particular injury, sickness or pregnancy does not mean that it is a Medically Necessary service or supply, as defined. The definition of Medically Necessary used herein relates only to coverage and differs from the way in which a physician engaged in the practice of medicine may define medically necessary.

If your Plan definition of "Medically Necessary" is different, you will amend it to be consistent with ours. If we change the definition of Medically Necessary, you will amend your Plan definition after written notice from us.

    **b.    Medical Management Services**

        **i.    Medical Necessity Determinations.** We will review health care services and supplies to determine whether they are Medically Necessary, as defined above. The review will include some or all of the following services according to the Plan's provisions:

            (A)    Preadmission review of proposed hospital confinements.

            (B)    Concurrent review of hospital confinements and discharge plans.

            (C)    Prospective and concurrent review of certain ancillary services.

            (D)    Prospective and concurrent review of care for mental health and substance abuse conditions.

            (E)    Retrospective review of all medical services.

            (F)    Maternity management review including educational material for expectant members.

        **ii.    Authorization of Benefit Payment.** If we determine that the service or supply is Medically Necessary, then we will authorize the payment of Plan benefits, if payable under the other Plan provisions. If the review is prospective or concurrent, the authorization shall include appropriate conditions, such as verification of current and continued eligibility of the Plan Participant.

        **iii.    Denial of Payment of Benefits.** If we determine the service or supply is not Medically Necessary, then we will deny payment of Plan benefits. We will notify the Participant of

23

the denial and of the Participant's right to appeal the denial. This notification will be designed to comply with ERISA requirements for denial notices.

iv. **Appeals of Denied Benefits.** If we deny payment of Plan benefits, we will provide the appeal services outlined in Section 13.2.

c. **Additional Services**

i. **Notification Requirements.** We will verify whether Participants have met any Plan requirement to notify us prior to receiving specified health care services and supplies and apply that information when we determine the amount of benefits payable.

ii. **Case Management Referrals.** We will identify cases that may be appropriate for Case Management Services.

iii. **Mental Health and Substance Abuse Assistance.** To the extent required by the Plan we will provide access to mental health professionals for mental health and substance abuse conditions twenty-four (24) hours a day, 7 days a week, 365 days a year.

**13.7 Managed Care Network Services**

a. **Definitions**

i. **Continuing Care Provider** means a health care provider who is rendering professional services of a continuing and ongoing nature to a Participant with respect to an injury, sickness or pregnancy existing prior to the date the Participant becomes covered by a Plan option that provides for a "Primary Care Physician" where the professional relationship was initiated prior to that date.

ii. **Managed Care Network** means a network of participating health care providers who, as independent contractors, have entered into contractual arrangements under which they agree to provide health care services to Participants and to accept negotiated fees for these services.

iii. **Network Provider** means a health care provider who participates in a Managed Care Network.

b. **Network Access**

i. **The Managed Care Network.** We will make available to you and the Participants a Managed Care Network, as follows:

(A) Located in geographical sites to which we agree.

(B) With Network Providers who render the following type of health care services and supplies:

(i) Medical care.

(ii) Mental health and substance abuse care.

(iii) Prescription drugs.

ii. **Provider Directories and ID Cards.** We will provide the following standard materials to you for your distribution to Participants:

(A) Directories of Network Providers with periodic updates.

(B) Identification cards to be used by Participants to identify their participation in the Managed Care Network.

c. **Network Development and Maintenance**

i. **Participation of Providers.** We will determine whether, which, and under what conditions health care providers will participate in the Managed Care Network we provide to you.

ii. **Credentialing and Recredentialing.** The determination of provider participation will be based on criteria we establish. It will include a process for determining whether the providers possess certain credentials and meet other standards in order to join the Network and whether they continue to do so in order to remain in the Network.

iii. **Changes in the Network.** The number, types and particular health care providers who are Network Providers can change at any time. However, we will use our best efforts to:

(A) Provide you with notice of any material changes. Notice will be given in advance or as soon as reasonably possible.

(B) Retain in the Managed Care Network an adequate number and type of Network Providers so that Participants will have a wide range of services and choices available to them.

(C) Assign a new Primary Care Physician (PCP) to a Participant when their PCP is no longer a Network Provider or has changed network status so that he/she is no longer a PCP. This assignment is made by us to ensure continuity of coverage at the Network level for the Participant and the Participant may choose another PCP within the network.

d. **Additional Network Services**

i. **Grievance Process.** We will maintain a grievance process so that Participants may obtain help and assistance with and express their opinions about their use of the Managed Care Network.

ii. **Referral Process.** We will maintain a referral process so that Participants can obtain referrals to health care providers that they need for care covered by the Plan in situations where a Network Provider is not available to fill that need.

iii. **Transition of Care.** Participants receiving care rendered by Continuing Care Providers will be paid benefits pursuant to the provisions of the Plan at the benefit level rate established for care rendered by Network Providers, for so long as the provider's Continuing Care Provider status remains in effect. We will determine whether a provider constitutes a Continuing Care Provider and for how long the provider's status shall remain as a Continuing Care Provider based on whether the course of treatment provided by the Continuing Care Provider has ended and whether a Network Provider can reasonably assume the duties of the Continuing Care Provider without causing medical harm to the Participant. We shall have the discretion, authority and responsibility to make the decision as to whether and for how long a provider constitutes a Continuing Care Provider.

If we determine that a provider does not constitute a Continuing Care Provider, we shall notify the Participant that benefits for services rendered by the provider will not be paid at the Network Provider level rate. This determination shall constitute a denial of benefits and shall be appealable by the claimant as set forth in Section 13.2 of this Agreement.

e. **Miscellaneous Provisions**

i. **Independent Contractors.** We do not employ Network Providers and they are not our agents or partners. Network Providers participate in Managed Care Networks only as independent contractors. Network Providers and the Participants are solely

25

responsible for any health care services rendered to Participants and for all treatment decisions of Participants.

ii. **Amount of Plan Benefits.** Plan benefits for health care services rendered by Network Providers will be equal to the amounts the Network Providers agreed to accept in the contractual arrangements governing the Providers' participation in the Managed Care Network.   These amounts could be traditional fees for services, capitated rates, or some other kind of fee or rate. A capitated rate is an amount paid to a health care provider on a per participant per month basis or a similar arrangement.

iii. **Benefit Differential.** Your Plan provides a higher level of benefits for care that is rendered by Network Providers than for care that is rendered by other providers. If the Managed Care Network you utilize requires, now or in the future, a certain benefit differential, you will amend your Plan to provide for it.

**13.8    Transplant Benefit Management Program**

**a.    Definitions**

i. **Medically Necessary** means the definition shown in Section 13.6, Medical Management Services.

ii. **Qualified Procedure** means one of the following:

(A)    Liver transplant.

(B)    Heart transplant.

(C)    Lung transplant.

(D)    Heart/Lung transplant.

(E)    Kidney transplant.

(F)    Pancreas transplant.

(G)    Kidney/Pancreas transplant.

(H)    Bone Marrow/Stem Cell transplant.

(I)    Other transplant procedures when we determine that it is Medically Necessary to perform the procedure at a Designated Transplant Facility.

The types of Qualified Procedures can be changed at any time. We will provide you with written notice of any changes. You agree to amend the Plan consistent with the changes within a reasonable period after notice is given.

iii. **Designated Transplant Facility** means a facility designated by us to render Medically Necessary Qualified Procedures to Participants.

**b.    Transplant Benefit Management Services**

**iv.    Access to Designated Transplant Facilities**

(A)    We will provide access to our network of Designated Transplant Facilities and corresponding discounts for all Participants who are authorized to receive a Qualified Procedure by a Designated Transplant Facility in accordance with the Facility's guidelines for transplantation services.

If we determine that a Qualified Procedure is Medically Necessary, but the Designated Transplant Facility determines that the Participant does not meet all of its acceptance criteria, we will make a reasonable effort to locate an appropriate alternate facility.

26

(B)     We will credential and recredential the transplant programs at Designated Transplant Facilities with respect to their historical experience and outcomes in the delivery of services for Qualified Procedures.

(C)     Services and supplies from a Designated Transplant Facility for Qualified Procedures include:

- The evaluation.

- Hospital and physician fees.

- Organ acquisition and procurement.

- Transplant procedures.

- Follow-up care for a period up to one year after the transplant.

- Search for bone marrow/stem cell from a donor who is not biologically related to the patient. If a separate charge is made for bone marrow/stem cell search, a Maximum Benefit of $25,000 will be payable for all charges made in connection with the search.

(D)     You agree that the Plan will pay for and cover as Plan benefits the services and supplies rendered to Participants for a Medically Necessary Qualified Procedure in accordance with the Transplant Benefit Management Program.

(E)     You delegate to us the discretion and authority to approve for payment under the Plan those services and supplies rendered to Participants for Medically Necessary Qualified Procedures.

(F)     We will reprice all claims submitted for services and supplies in conjunction with Medically Necessary Qualified Procedures rendered to Participants in accordance with the payment arrangement with the Designated Transplant Facilities.

**v.  Case Management Services**

(A)     We will determine if a Qualified Procedure is Medically Necessary under the terms of the Plan for Participants under the Plan.

(B)     We will provide the Participant with information, patient referral and case management.

(C)     If a Designated Transplant Facility is used, Medical Management will assist the Participant and family with travel and lodging arrangements. The Plan will provide for reimbursement of travel and lodging expenses as follows:

- Transportation of the patient and one companion who is traveling on the same day(s) to and/or from the site of the Qualified Procedure for the purposes of the evaluation, the transplant procedure and the necessary post-discharge follow-up.

- Reasonable and necessary expenses for lodging and meals for the patient (while not confined) and one companion. Benefits are available at a per diem rate of $50.00 for one person or $100.00 for two people.

- Travel and lodging expenses are only available if the transplant recipient resides more than 50 miles from the Designated Transplant Facility.

- If the patient is a covered dependent minor child, the transportation expenses of two companions will be covered and lodging and meal expenses will be reimbursed at the $100.00 per diem rate.



- There is a combined overall lifetime maximum of $10,000 per Participant for all transportation, lodging and meal expenses incurred by the Participant and companion(s) and reimbursed under the Plan in connection with all Qualified Procedures.

**c. Care Outside of the Transplant Benefit Management Program**

If the Participant chooses not to receive his or her care in connection with a Qualified Procedure pursuant to the Transplant Benefit Management Program, the services and supplies received by the Participant in connection with that Qualified Procedure will be paid under the Plan if and to the extent covered by the Plan without regard to the Transplant Benefit Management Program

(ASA ERISA 1/97)

# Exhibits

## Exhibit A

### Service Fees

This Exhibit lists the standard service fees and other service fees you must pay us for our services. These fees are effective for the period beginning January 1,1998 and ending January 1,2000*.

## Standard Service Fees for the medical benefits:

The following fees are subject to the adjustments set forth in Exhibit C or D.

(i) $31.00 per month per Employee covered under the "Point of Service" portion and "Exclusive Provider Option" portion of the Plan. (Includes $3.40 per person for BHCM.)

(ii) $13.15 per month per Employee covered under the "Out-of-Area" , passive "Preferred Provider" portion, plus 30% of savings not to exceed  $20.20 per month.  (Includes $1.48 per person per month for OPTUM)

(iii) $20.20 per month per Employee covered under the incentive "Preferred Provider" portion of the Plan,

(iv)  $.70 per claim for DPS Services.

For COBRA services:

First Year (1998):

$1,000 for the initial set-up

Qualifying Event Notification Set-up:  $500

$20 for each conversion

For all Subsequent years:

$20 enrollment fee

$5 for per Employeee for direct billing services

$5 Per Solicitation Package

$2.50 New Hire Standard Letter

* for the period from January 1, 1999 through January 1,200, the rates will not increase more than Consumer Price Index + 2%, not to exceed 4%.

## Service Fees For the flexible spending account benefits:

$18,342 per year payable at $1,528 per month for Administration and Banking Charges.

$2.75 per enrolled employee per month (healthcare only, dependent care only or both).

$1.35 per statement produced (to be produced annually in October).

## Interest on Service Fees

The following rates apply to Section 7.6, Payment Timing and Interest and Section 7.7, Reconciliation:

Interest Credit Rate: 4.5%
Interest Penalty Rate: 11.0% (will not apply to any unpaid 15% of disputed fees)

*3ə*

Exhibit B

## Exhibit B

**Reports**

We will provide the following reports to you:

.

| Name of Reports | Frequency |
|---|---|
| Analysis by type Report | On request |
| Payment to providers of service Report | On request |
| Cause code frequency Report | On request |
| Claims Utilization Report | On request |
| Coordination of benefits Report | On request |
| Large claims Report | Monthly |
| In-hospital Utilization Report | On request |

We may change or discontinue the above reports. However, if we do, we will nevertheless continue to provide you with substantially the same information.

Requests for reports at a greater frequency than listed above will require additional fees as determined by us.

*3 /*

## Exhibit C

**Performance Standards**

## Adjustment to Standard Service Fees

The Standard Fees payable by you for the services provided under this Agreement will be adjusted in accordance with the performance standards set forth in this Exhibit. Unless otherwise specified, these standards are effective for the period beginning January 1, 1998 and ending on January 1, 2001 each 12 month period during this period shall be called a "guarantee period". With respect to the aspects of our performance addressed in Exhibit C, these fee adjustments are your exclusive remedy.

## Administrative /Implementation Performance Standards

### Use of a formal Implementation Plan

Case implementations generally require the timely and accurate completion of tasks by us and by you. The completion of one task may be dependent on the completion of another task by the other party. It is imperative, therefore, that a formal implementation plan, which defines key tasks, dependencies and completion dates, be developed and agreed to by both parties. The lack of a mutually agreeable formal implementation plan will nullify these implementation guarantees in total. Failure on your part to complete, by the agreed upon dates, the key dependent tasks associated with the guarantees outlined below will also nullify that guarantee unless such failure has no adverse effect whatsoever on our ability to meet such guarantees.

## Claim Operations Performance Standards

### Time to Pay

We will complete processing of 90% of all claims we receive within 10 business days of receipt, as evidenced by our date stamp. All claims will be date stamped on the date of our actual receipt. Timeliness will be measured using the "Time to Pay" report produced by us on a monthly basis. The monthly report will be aggregated to produce results for the applicable guarantee period. The "Time to Pay" results are always rounded to the nearest whole percent. The calculation of our performance against this target is based upon the results for all centers servicing you.

A "claim" is a request for payment of a plan benefit made by a Participant or provider. A claim will be considered processed when the claim has been completely reviewed and a payment determination has been made.

Time to pay is measured the same way regardless of the timing of our responses to a claimant.

Failure to maintain a 90% score for a guarantee period will result in a credit applied to Service Fees payable by you in the next agreement period or, at your option, paid to you by check within 30 days after the end of the applicable guarantee period. The amount of the credit for our failure to meet this performance guarantee will equal three (3%) percent of all Service Fees paid by you during the applicable guaratee period, plus an additional one percent (1%) of such Service Fees for each full percentage point below 90% of the guarantee specified above, not to exceed an aggregate credit of five percent (5%) of such Service Fees.

### Dollar Financial Accuracy

We will maintain a Dollar/Financial Accuracy rate of not less than 99% for the guarantee period. Dollar/Financial Accuracy is measured by collecting a stratified random sample of claims processed by the offices servicing your account. The sample is reviewed to determine the percentage of claim dollars processed correctly out of the total claim dollars submitted for payment. The measurement will be done by our standard internal quality assurance program based on a periodic audit of all claims processed by the office(s) servicing your account.

The Dollar/Financial Accuracy rate for the guarantee period will be derived from the results of these monthly audits.

A "claim" is a request for payment of a plan benefit made by a Participant or provider. The calculation of our performance against this target is based upon the results for all centers servicing you.

Failure to maintain a 99% score for a guarantee period will result in a credit applied to the Service Fee payable by you in the next agreement period or, at your option, paid to you by check within 30 days after the end of the applicable guarantee period. The amount of the credit for our failure to meet this performance guarantee will equal three percent (3%) of all Service Fees paid by you during the applicable guarantee period, plus an additional one percent (1%) of such  Service Fees for each full percentage point below 99% of the guarantee specified above, not to exceed an aggregate credit of five percent (5%) of such Service Fees.

**Service/Data Accuracy Rate**

We will maintain a Service/Data Accuracy Rate of not less than 95% for the guarantee period. Service/Data Accuracy is measured by collecting a stratified random sample of claims processed by the offices servicing your account. The sample is reviewed to determine the percentage of non-financial service lines (i.e. any line that does not include financial data) processed correctly out of the total non-financial service lines processed in the sample. The non-financial service lines reviewed include, but are not limited to: Patient Name, Employee Name, Employee Address, Employee Social Security Number, Benefit Assignment (i.e., was payment made to the correct person), Date of Service, Charge, Cause Code, Diagnosis Code, Remark Code (i.e., message appearing on the EOB), and Service Code.

A "claim" is a request for payment of a plan benefit made by a Participant or provider. The calculation of our performance against this target is based upon the results for all centers servicing you.

Failure to maintain a 95% score for a guarantee period will result in a credit applied to the Service Fee payable by you in the in the next agreement period or at your option, paid to you by check within 30 days after the end of the applicable guarantee period. The amount of the credit for our failure to meet this performance guarantee will equal three percent (3%) of all Service Fees paid by you during the applicable guarantee period, plus an additional one percent (1%) of such Service Fees for each full percentage point below 95% of the guarantee specified above, not to exceed an aggregate credit of five percent (5%) of such Service Fees.

## Member Phone Service Performance Standards

**Average Speed to Answer**

This standard applies to the claim offices and/or the health plan member services offices which provide service for your employees. We will guarantee that calls will sequence through our automated telephone call distribution system and remain on hold no longer than 35 seconds on average before a customer service representative takes the call. The Average Speed to Answer will be measured by the standard tracking reports produced by our automated phone system for all the calls handled by a particular office during the guarantee period.

The calculation of our performance against this target is based upon the average results for all centers servicing the customer. The average will be determined based on the percentage of employees served by each center.

If the Average Speed to Answer for a guarantee period is greater than 35 seconds, for all locations providing member phone service to your employees, a credit to the Service Fees payable by you will be made in the next agreement period or at your option, paid to you by check within 30 days after the end of the applicable guarantee period. The amount of the credit for our failure to meet this performance guarantee will equal three percent (3%) of all Service Fees paid by you during the applicable guarantee period, plus an additional one percent (1%) of such Service Fees for each second over the guarantee specified above, not to exceed an aggregate credit of five percent (5%) of such Service Fees.

**Abandonment Rate**

This standard applies to the claim offices and/or the health plan member services offices which provide service for your employees. We will guarantee that calls will sequence through our automated telephone call distribution system such that the average abandonment rate will be no greater than 5 percent. The Abandonment Rate

Exhibit C

results will be measured by the standard tracking reports produced by our automated phone system for all the calls handled by a particular office during the applicable guarantee period.

The calculation of our performance against this target is based upon the average results for all centers servicing you. The average will be determined based on the percentage of employees served by each center.

If the Abandonment Rate for a guarantee period is greater than 5 percent, for all locations providing member phone service to your employees, a credit to the Service Fee will be made in the next period. The amount of the credit for our failure to meet this performance guarantee will equal three percent (3%) of all Service Fees paid by you during the applicable guarantee period, plus an additional one percent (1%) of such Service Fees for each second over the guarantee specified above, not to exceed an aggregate credit of five percent (5%) of such Service Fees.

## Exhibit D

### Claim Risk Sharing

**Purpose**

The Risk Sharing Program provides sharing above and below a per Covered Employee claim target for Covered Employees enrolled in the Plan.

**Target Setting**

For the January 1, 1998 through December 31, 1998 period, target claims are established by:

- Calculating Incurred Claims based on Incurred Claims paid through four months after the end of the Prior Year.

- Adjusting January 1, 1997 through December 31, 1997 Incurred Claims for the impact of any managed care changes (benefit design, usage/behavioral changes, discounts, medical management, and area cost changes) and trend.

- Based on the claim details available to date, we are projecting target PEPM at $234.41 for the POS plan and $219.94 for the EPO Plan.

For the 1999 calendar year, the target will be established using the Incurred Claims from January 1, 1998 to December 31, 1998, with trend based on the index as described in the Trend Index Formula below. This index formula will be finalized during the first quarter of 1999 following the completion of the Applicable Year, once all components are available.

**Calculation of Actual Claims**

Actual Incurred Claims will be determined 4 months after the end of the prior year on a date of service basis. Claim dollars in excess of $150,000 per Covered Employee and other limitations set forth in the Assumptions section below, will be excluded from the Risk Sharing Target and Actual Claim calculations.

Timeline

The following timeline is based on a January 1, 1998 effective date.



| 1/1/97 | | | | |
|---|---|---|---|---|
| 1/1/00 | 1/1/98 | 5/1/98 | 1/1/99 | 5/1/99 |

Prior Year                    Applicable Year                              Next Year

5/1 (Current Year)                    Finalize target claims for the Prior Year

5/1 (Next Year)                    Determine actual claims for the Prior Year and calculate the Risk Sharing results for the Applicable Year

35

## Risk Sharing Parameters

The first 5% of Benefits Due above and below the target will be borne 100% by National Service Industries. For Benefits Due above 5% United HealthCare and National Service Industries will each bear 50% to a maximum of $6 PEPM for Covered Employees enrolled in the Plans. For Benefits Due below 5%, United HealthCare and National Service Industries will each share 50% of the savings to a maximum of $6 PEPM.



|  | $6 | 95% | | 105% | $6 |
|---|---|---|---|---|---|
|  | | | TARGET | | |
| National Service Industries 100% | 100% | 50% | 100% | 50% | |
| United HealthCare 0% | 0% | 50% | 0% | 50% | |

The Service Fees set forth in Exhibit A will be adjusted as follows: (1) If Actual Claims under the Plan for the Applicable Period exceed 105% of the Target for that Applicable Period, the Service Fees set forth in Exhibit A charged for United HealthCare's services related to the Plan for that Applicable Period shall be reduced by the amounts set forth in the Risk Sharing Parameters above; (2) Amounts by which Service Fees due for the relevant Applicable Period are reduced as set forth above will be credited to National Service Industries and will be reflected in the statement of the month following the date such reduction in the Service Fee has been determined.

### Trend Index Formula (1/98-1/99)

Adjusted Medical CPI + 2.0%

(1) Adjusted Medical CPI: 54.4% weight for average change in the Hospital and Related Medical Services component of the unadjusted Consumer Price Index for all Urban Customers (CPI-U): plus 40.2% weight for average change in the Services by Other Medical Professionals component of the CPI-U. Change based on average value for the 12-month period which coincides with the year for which Trend is being calculated over the average values for the previous 12-month period.

Example:

If the Adjusted Medical CPI rate (1) is 5%, then the guaranteed POS trend rate would be 5% + 2% =7%

## Assumptions

- This Agreement is based on Claims Incurred beginning on the effective date of January 1, 1998 assuming at least 500 employees (as of December 31, 1997) are enrolled in the Plans for the Applicable Year.
- We may amend the claim projection in the following circumstances:
    - if there is a change in benefits under the Plans;
    - if the number of Covered Employees changes by 10% or more;
    - if the demographic characteristics of Covered Employees that could affect the amount of claims under the Plan change significantly (i.e. result in a demographic factor adjustment of +5% from initial levels), including but not limited to, the number, location, sex, proportion of families electing coverage, and age of Covered Employees or;

- if state, federal, or other governmental regulations are changed reulting in increased claims or benefits;
- if during the Applicable period or subsequent periods, there is an event in which (10) or more Covered Employees incur an illness or injury resulting from a common unanticipated occurence (e.q. plane crash, food poisoning) or
- if the amount or percentage of contributions required to be paid by Covered Employees to the Plan or to any option under the Plan changes

- This Risk Sharing arrangement applies to active employee groups only.
- Any and all groups not included in both the base year and the guarantee year will be excluded from the Risk Sharing calculations.
- Claim projections per employee for the first policy period are to be based on paid claim dollars for the January 1, 1997 through December 31, 1997 dates of service and Covered Employee counts to be determined.
- Claims will be paid using United HealthCare's standard claim practices and policies. Any claim exceptions approved by National Service Industries will be excluded from Risk Sharing.
- This Risk Sharing Arrangement EXCLUDES Prescription Drugs.

For the puposes of this Exhbit D only, the following definitions shall apply:

**Applicable Period** means the twelve (12) month period beginning January 1, 1998.

**Prior Year** means the twelve (12) month period beginning January 1, 1997

**Benefits Due** means the dollar amount represented by checks or drafts which were issued in satisfaction of Incurred Claims, provided that the following benefits are excluded; (a) benefits, or any portion thereof, which have been denied by United HealthCare, but which are paid at the direction of National Service Industries, (b) payments made to Medicare contractors pursuant to the Health Care Financing Administration's "Data Match" Medicare secondary reimbursement program, and (c) prescription drug claims.

**Incurred Claims** means an in-network claim for payment of Plan benefits for Covered Employees with regard to health care services that have been rendered. The date as of which a claim is considered to be incurred is determined on a date-of-service basis.

**Covered Employees** means an active National Service Industries employees covered under the Plan, and for a particular year means the arithmetic average of the number of employees covered under a specified plan on the first day of each of the twelve (12) months of the year, excluding Medicare-eligible lives.

**PEPM** means per Covered Employee per month.

**Plan** means the POS and EPO options of the National Service Industries Welfare Benefit Plan.

## Exhibit E

**Third Party Disclosure Agreement**

This THIRD PARTY DISCLOSURE AGREEMENT ("Agreement") is entered into by and between NATIONAL SERVICE INDUSTRIES, INC. ("Employer), Examiner Name ("Examiner") and United HealthCare Insurance Company United HealthCare Service Corp. ("United HealthCare"). These parties acknowledge and agree as follows:

1. **ASA:** Employer and United HealthCare entered into an Administrative Services Agreement ("the Agreement") under which United HealthCare provides claims administration and other services for Employer's employee welfare benefit plan ("Plan"). Pursuant to the Agreement, Employer has retained Examiner to perform an examination, audit or other evaluation of the files, books and/or records of United HealthCare pertaining to the Plan, or to perform another function for the Plan which requires access to such files, books and/or records ("Examination").

2. **Consideration:** Employer has requested that solely for purposes of the Examination, United HealthCare disclose to Examiner certain documents, statistical information and other information which is commercially valuable, confidential, proprietary, trade secret and also materials which may contain medical or other individually identifiable information ("Confidential Information"). United HealthCare has agreed to such disclosure subject to the terms of this Agreement. There is mutual consideration for this Agreement.

3. **Examination Date:** The Examination shall take place on the date or date(s) mutually agreed upon by the parties.

4. **Confidential Information:** All documents and information of United HealthCare, its agents, subsidiaries and affiliates, disclosed to Examiner in connection with the Examination, including all copies thereof, constitutes Confidential Information disclosed by United HealthCare to Examiner on a confidential basis under this Agreement, and must be used by Examiner only as permitted by this Agreement. Confidential Information shall not include information: (i) disclosed to Examiner without restriction prior to the Examination; (ii) generally available to the public or generally known in the insurance industry or employee benefit consulting community prior to or during the time of the Examination through authorized disclosure; (iii) obtained from a third party who is under no obligation to United HealthCare not to disclose such information; or (iv) required to be disclosed by subpoena, or other legal process.

5. **Title:** Title to Confidential Information will remain at all times in United HealthCare and no transfer of any interest therein is granted.

6. **Use:** Examiner (a) shall not use Confidential Information (deemed to include using, exploiting, duplicating, recreating, modifying, decompiling, disassembling, reverse engineering, translating, creating derivative works or disclosing Confidential Information to another person or permitting any other person to do so) except for purposes of the Examination; (b) shall limit use of Confidential Information only to its authorized employees (deemed to include employees as well as individuals who are agents or independent contractors of Examiner) who have a need to know for purposes of the Examination; (c) shall not copy Confidential Information unless express, prior approval of United HealthCare to do so has been obtained; and (d) shall, if required by subpoena or other legal process to disclose Confidential Information, give United HealthCare reasonable prior notice of such disclosure.

7. **Conflicts of Interest:** Examiner shall not use Confidential Information in any manner to further its own interests other than in performing the Examination or in any manner which it knows may be contrary to the business interests of United HealthCare.

8. **Relinquishment:** Examiner shall at the conclusion of the Examination relinquish to United HealthCare all Confidential Information. If during the course of the Examination it is discovered that this Agreement has been breached by Examiner then all Confidential Information shall be relinquished upon demand by United HealthCare.

*3ƍ*

9.  **Legal Privacy Requirements:** Certain Confidential Information including medical and other individually identifiable information is subject to legal privacy requirements, a violation of which will cause irreparable harm to United HealthCare. Examiner shall comply with all such requirements.

10. **Persons Bound:** This Agreement binds Examiner, its successors, assigns, agents, employers, subsidiaries and affiliates and Examiner agrees that each, prior to accessing Confidential Information, will have agreed to the terms of this Agreement. This Agreement binds United HealthCare, its successors, assigns, agents, subsidiaries and affiliates and the rights given by this Agreement to United HealthCare also extend to these persons and entities. This Agreement binds Employer, its successors, assigns, agents, subsidiaries and affiliates.

11. **Damages and Injunctive Relief:** Unauthorized use of Confidential Information by Examiner is a material breach of this Agreement resulting in irreparable harm to United HealthCare for which the payment of money damages is inadequate. It is agreed that United HealthCare, upon adequate proof of unauthorized use, may immediately obtain injunctive relief in any court of competent jurisdiction enjoining any continuing or further breaches and may obtain entry of judgment for injunctive relief. Examiner consents to said injunctive relief and judgment. Employer and Examiner agree to indemnify and hold harmless United HealthCare with respect to any claims and any damages caused by Examiner's breach of this Agreement. Nothing in this Agreement shall be construed to limit United HealthCare's remedies at law or equity in the event of a breach.

12. **Term of Agreement:** This Agreement shall remain in full force and effect so long as any Confidential Information remains commercially valuable, confidential, proprietary and/or trade secret, but in no event less than a period of three (3) years from the date of the Examination.

13. **Assignments:** Neither this Agreement nor Examiner's rights or obligations hereunder may be assigned without United HealthCare's prior written approval.

14. **General:** (a) This Agreement is the entire understanding between the parties as to the subject matter hereof. (b) No modification to this Agreement shall be binding upon the parties unless evidenced in writing signed by the party against whom enforcement is sought. (c) Headings in this Agreement shall not be used to interpret or construe its provisions. (d) The alleged invalidity of any term shall not affect the validity of any other terms. (e) This Agreement may be executed in counterparts.

The parties have caused their authorized representatives to execute this Agreement.


**NATIONAL SERVICE INDUSTRIES, INC.**

By    _____
            Authorized Signature

Name    _____

Title    _____

Date    _____



**Examiner Name**

By    _____

39

Authorized Signature

Name _____

Title _____

Date _____


**UNITED HEALTHCARE INSURANCE COMPANY**

By _____

Authorized Signature

Name _____

Title _____

Date _____



# Exhibit B

**Jack Hanna**
**Demographics and Eligibility Screens**



**Jack Hanna**
**Demographics and Eligibility Screens**



**Jack Hanna**
**Demographics and Eligibility Screens**



**Jack Hanna**
**Demographics and Eligibility Screens**



44

**Jack Hanna**
**Demographics and Eligibility Screens**



**Jack Hanna**
**Demographics and Eligibility Screens**



46